IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| GERALD G. KAMAU, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 11-5317 |
| | : | |
| EAST PENN MFG. CO., INC., | : | |
| Defendant. | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                             February 28, 2013

Gerald Kamau filed this employment discrimination action against his former employer, East Penn Manufacturing Company, Inc. (East Penn). Kamau alleges he was retaliated against in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.*, and the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951 *et seq.*[1] East Penn moved for summary judgment. For the following reasons, I will grant the motion.

**I.    BACKGROUND**[2]

East Penn is a manufacturer of batteries with its corporate office and largest manufacturing facilities located in or near Lyon Station, Pennsylvania. Doc. No. 24-3 ¶ 1. Kamau began working at East Penn in 2004. He progressed through a series of higher

---

[1] On January 12, 2012, I granted East Penn's partial motion to dismiss Kamau's race and national origin-based harassment claims under Title VII and § 1981. East Penn did not move to dismiss Kamau's same claim under the PHRA at that time, but it does move for summary judgment now. Doc. No. 24-2 at 20. Kamau never supplemented the allegations surrounding this claim or sought to develop it through discovery. Because claims under the PHRA are analyzed in the same manner as those under Title VII, Gomez v. Allegheny Health Services, Inc., 71 F.3d 1079, 1084 (3d Cir. 1995), Kamau's claim of race and national origin-based harassment under the PHRA is deficient for the reasons identified in my Order of January 12, 2012. In any event, Kamau fails to even mention this claim in response to East Penn's motion, and he has therefore waived it. Markert v. PNC Fin. Services Group, Inc., 828 F. Supp. 2d 765, 773 (E.D. Pa. 2011).

[2] The facts in this section are undisputed unless otherwise noted.

level jobs, eventually rising to machine operator, the last position he held at East Penn. Each progression was accompanied by a wage increase. Id. ¶¶ 2-3.

### A. The Tire Deflation Incidents

On September 22, 2009, Kamau met with Jason Huey, assistant plant manager, and Tony DiBenedetto, personnel coordinator. Id. ¶ 5. At the meeting, Kamau claimed that on June 25, July 22, August 20, and September 14, 2009, he had an "almost" flat tire after his car was parked in the East Penn employee parking lot. He also told Huey and DiBenedetto that on September 14 he had the tire checked and there was nothing wrong with it. Id. ¶ 6. Kamau told Huey and DiBenedetto that on September 22 he noticed following his shift that the air pressure in his car's right rear tire was again low. Although Kamau did not know who was responsible, he suspected co-workers Bill Hoier, Lance Parnoski, Seth Lorah, Mike Schaeffer, and possibly his immediate supervisor, Mike Zentner. Id. ¶ 7. Kamau claimed these individuals were responsible because he had an argument several months before with Schaeffer, who maintained friendships with Hoier, Parnoski, Lorah, and Zentner. Id. ¶ 8. Huey and DiBenedetto offered Kamau the option of switching parking lots and locker rooms. Kamau declined but said he would think about it. Kamau also told Huey and DiBenedetto he was going to transfer out of his department. Id. ¶ 10.

The next day, September 23, Huey talked with Zentner about Kamau's allegations. Neither Zentner nor Schaeffer was aware of anyone letting air out of Kamau's tire. Id. ¶ 11. Zentner said he would monitor the situation and increase his surveillance of the employees in his work area. East Penn's security department, which monitors and patrols

2

the grounds and parking lots, was also notified about Kamau's complaint and directed to increase surveillance of the area where he parked. As a matter of routine, DiBenedetto also notified his superior, personnel director Alison Snyder, about Kamau's complaint. Id. ¶ 12.

At Kamau's request, he met with Snyder on September 30. Willie Garcia and Keith Schlegel, personnel coordinators, were also present. Snyder wanted Garcia and Schlegel at the meeting because they both worked on the third shift, could monitor the situation, and help Snyder with the investigation of Kamau's allegations. Id. ¶ 13. Kamau requested the meeting with Snyder to address the alleged tire deflation incidents. In the meeting, Kamau claimed that nothing had been done to address his complaint since his meeting a week earlier with Huey and DiBenedetto. Id. ¶ 14. Kamau repeated his claim that his car tires continued to lose air while parked in East Penn's parking lot. Kamau stated that he never found the tires flat or slashed, and there was no sign of nails or other objects in the tires. Id. ¶ 15. Kamau claimed that the air pressure in his tires was lowered from approximately 30 psi to 28 psi and that Ross Pinter, a fork lift driver, was responsible, although Kamau never noticed Pinter leave his work area for any extended period of time. Id. ¶ 16.

Snyder asked Kamau for information about his vehicle. She told him that East Penn would take measures to keep his car under surveillance while it was in the parking lot. Id. ¶ 17. Snyder asked Kamau if he wanted to transfer to a different building, location, or department. Kamau declined the offer, saying that he liked his current job, shift, and plant location, and would prefer to transfer at his own will to a job

that he wanted to bid on. Id. ¶ 18. Snyder assured Kamau that if he did transfer, it would be to a similar job with the same pay and benefits. Kamau again refused. Snyder also asked Kamau if he wanted to park in a reserved parking area directly next to the building in which he worked. Kamau declined this offer as well. Id. ¶ 19. Finally, Snyder asked Kamau if he wanted to park in another location on the complex, which would not be close to his department or where other co-workers in his department parked, but within reasonable walking distance to the building in which he worked. Kamau again refused her offer. Id. ¶ 20. Kamau stated that the supervisors in his department did nothing to help him and were out to get him. When Snyder asked Kamau for specific examples to support his allegations, Kamau offered none. Id. ¶ 21. Snyder concluded the meeting by telling Kamau that East Penn would tighten surveillance and security in the area where he parked his car and that if he saw or heard anything suspicious, he should contact her or his supervisors immediately. Snyder gave Kamau her business card with her cell phone number and told him to contact her at any time he felt he had a problem. Id. ¶ 22.

Following the September 30 meeting, Snyder directed Garcia to interview the employees Kamau named. They all denied Kamau's accusations. Snyder heard nothing further from Kamau regarding the matter until early December 2009. East Penn was never able to determine if someone was in fact deflating Kamau's tire. Id. ¶ 23.[3]

---

[3] East Penn became aware of several other related incidents when it was served Kamau's charge of discrimination in early December 2009 and when Kamau's work journal was produced in June 2012. Id. ¶ 24. In his charge, Kamau claimed that Pinter questioned him in a manner that led him to believe that Pinter was involved in the tire deflation incidents. Kamau also claimed that on the same day as the Pinter incident, he took his wife's car to the dealership for servicing. Id. ¶ 25. While there, Kamau claimed that Hoier's mother, whom he had never met, questioned him about his children and his residence, which led Kamau to believe that Hoier was involved in the tire deflation incidents. Id. ¶ 26.

4

### B. Concern Recommendation

In a meeting on December 10, 2009, Kamau told Snyder that there were at least 100 people following him from work every day. He also told her that he was being stalked by an unknown person and followed by the police, and that small amounts of air were again being let out of his tires by unknown persons. Id. ¶ 29.[4]

Snyder became concerned about Kamau's fitness for duty and decided to recommend to him that he seek professional counseling with Concern Counseling Services (Concern), East Penn's employee assistance program (EAP) provider, for an evaluation. Kamau refused. Id. ¶ 30. Snyder decided not to force the issue at that time. Kamau continued to work his regular schedule without any change in his wages, benefits, or working conditions and without reporting any further incidents to East Penn. Id. ¶ 31.

### C. Locker Theft Incidents

On December 29, 2009, Kamau went to Zentner and reported that on two occasions someone had broken into his locker. Kamau told Zentner that if it happened again, he would only tell Zentner "on his way out of here." Id. ¶ 32. Zentner was concerned about Kamau's remarks and felt threatened by them, although David Guiles, personnel representative, interpreted Kamau's remarks merely as an intention to resign.

---

Kamau wrote about this incident in his work journal, claiming that not only was Hoier's mother present, but also Hoier's grandmother, Lorah's father, and Lorah's grandfather. Kamau believed all these individuals had been sent by Hoier and Lorah to "possibly check and find anything illegal or odd about [him]." Id. ¶ 27. In a journal entry dated October 2, 2009, Kamau claimed to have found a screw in his tire, which he believed had been deliberately inserted while he was at work by a co-worker. Id. ¶ 28.

[4] Kamau described in his work journal other strange incidents he was allegedly involved in, such as picking up an unknown hitchhiker on East Penn's property early one morning in February 2009, co-workers informing the local police that he was involved in illegal activities, and several vehicular stalking incidents involving unknown persons and the Pennsylvania State Police. Kamau believed all these incidents had a connection to East Penn. Id. ¶ 50.

5

That same day, Guiles and Mike Rasool, personnel representative, met with Kamau to investigate the allegations he reported to Zentner. Id. ¶ 33. Kamau told Rasool and Guiles that on two occasions about a month before someone broke into his locker. The only item missing, according to Kamau, was a wash cloth. No other items were taken. There was no sign of forced entry to Kamau's locker. Id. ¶ 34. Kamau told Rasool and Guiles that one of his co-workers on either side of his locker was responsible. Kamau believed that one of the two had obtained his locker combination by looking over Kamau's shoulder. Id. ¶ 35. In response to his allegations, Kamau was offered the opportunity to move to another plant in the same job. He declined the offer and then said to Rasool, "It's like Osama bin Laden. He multiplies and trouble follows him." Id. ¶ 36. Rasool and Guiles asked Kamau if there was anything East Penn could do for him. He replied, "Nothing," and said he would not be at East Penn much longer. Rasool reported this incident to Snyder and expressed his concern about Kamau's reference to bin Laden. Id. ¶ 37.

A week later, on January 7, 2010, Kamau reported to Zentner that someone opened his locker (which was locked) and stole a newspaper. Zentner immediately reported this incident to Garcia. The three of them then went to Kamau's locker. Kamau proceeded to describe what happened. Id. ¶ 38. Kamau told Zentner and Garcia that the person who used the locker next to his (a first-shift employee) had obtained his locker combination by looking over his shoulder the previous morning. Id. ¶ 39. Kamau stated that the first-shift employee gave Kamau's locker combination to a third-shift employee,

who used the locker on the other side of Kamau's locker, for the purpose of opening Kamau's locker when he was on the plant floor working. Id. ¶ 40.

Zentner and Garcia had Kamau go through the motions of the incident to better understand his story. Kamau claimed that the third-shift employee went into Kamau's locker while Kamau was working and stole a newspaper but did not take Kamau's cell phone or wallet (or any money from the wallet). No other personal items were missing except the newspaper. Id. ¶ 41. Kamau then abruptly changed his story and told Zentner and Garcia that the newspaper might be in his car. Kamau and Garcia immediately went to Kamau's car. Id. ¶ 42. The newspaper was lying on the passenger side front seat. Kamau told Garcia that perhaps the employee took the newspaper from his locker and put it in his car. He then said that he was not crazy but it might be time for him to resign. Id. ¶ 43.[5]

### D. Concern Mandate

Snyder met with Kamau the next day, January 8, 2010. East Penn was concerned about Kamau's fitness for duty, as well as his and his co-workers' safety and wellbeing. Id. ¶ 45. The purpose of the meeting was to discuss whether Kamau should be required to undergo a fitness-for-duty evaluation as a condition of continued employment at East Penn. East Penn investigated all of Kamau's accusations and found them to be without any factual basis. Id. ¶ 46. During the meeting, Snyder again urged Kamau to go to Concern. Kamau again refused. Id. ¶ 47. Snyder again offered to transfer him. Kamau again refused and said that he wanted to quit his employment. Snyder told him to think

---

[5] In his work journal, Kamau claimed that a "Mexican" co-worker was trying to steal his cellphone from his locker using an old combination. Id. ¶ 44.

about his decision over the weekend. Kamau agreed to meet with Snyder on Monday, January 11. Id. ¶ 48.

On January 11, Kamau met with Snyder and DiBenedetto and told them he had changed his mind over the weekend about resigning and now agreed to be referred to Concern. Id. ¶ 51. Snyder discussed the fitness-for-duty evaluation with Concern as a condition of continued employment. During the course of that meeting, Snyder reviewed the paperwork with Kamau and Kamau signed East Penn's standard form involving an employee referral to Concern. Id. ¶ 52. Snyder explained to Kamau the reasons for the mandatory referral. She also explained that Concern would not reveal to East Penn any discussions he had with Concern's counselors. Id. ¶ 54. Kamau understood in the meeting that he would be required to authorize Concern to release information to East Penn related to his fitness for duty. Id. ¶ 55. Kamau agreed that he would schedule an initial appointment with a Concern counselor by January 13. Kamau also understood that he would need to sign Concern's standard form authorizing the release of certain information (the Concern Release) to East Penn solely to confirm his attendance and receive a recommendation from Concern as to his fitness for duty and ability return to work. Id. ¶ 56. Snyder informed Concern by email on Monday, January 11 of Kamau's decision to seek counseling. Attached to Snyder's email was the East Penn mandate that Kamau signed. Id. ¶ 57.

### E. Kamau's Termination

As of January 21, 2010, East Penn had not received any information from Kamau or from Concern. During a telephone conversation between Snyder and Kamau on

January 21, Kamau told her that he had attended two sessions at Concern and had signed all necessary forms, including the Concern Release for East Penn. Id. ¶ 58. Although unknown to East Penn at that time, Kamau had signed a Concern Release but it only authorized his primary care physician (PCP) to receive information from Concern. The Concern Release to his PCP was the only such release that he signed. Id. ¶ 59. Kamau never signed a Concern Release for East Penn. Id. ¶ 60. When Snyder contacted Concern, she was told that Concern could not discuss any information about Kamau. Id. ¶ 61. When Snyder asked Concern if Kamau had signed a Concern Release for East Penn, she was told by Concern that if Kamau had signed it, Concern could speak with her, but that it could not speak with her if he had not signed it. Concern told Snyder that they could not speak to her regarding Kamau as of that date. Id. ¶ 62.

On Friday, January 22, Snyder spoke with Kamau by phone and requested that he meet her the following Monday morning, January 25. She requested the meeting because she wanted to go the "extra mile" in trying to get Kamau to sign the Concern Release for East Penn in order to save his job. Id. ¶ 63. Kamau met with Snyder and DiBenedetto as scheduled in her office. Id. ¶ 64. Snyder reviewed the events that had transpired since he had agreed to go to Concern, including her telephone discussion with Concern on January 21. She then showed him the Concern Release for East Penn and asked him to sign it. Id. ¶ 65. Kamau responded that he thought that he had already signed the Concern Release. Id. ¶ 66. Snyder replied that the information she had received from Concern led her to conclude that he had not signed the Concern Release for East Penn. After numerous attempts to persuade Kamau to sign the form, including having a manager from Concern

9

on the phone with Kamau explaining the form to him, he told Snyder that he would go to Concern's Wyomissing office and sign the form there. Id. ¶ 67. Snyder then told Kamau that she would give him until Friday, January 29, to sign the form, but if it was not signed by then, his employment would be terminated. Id. ¶ 68.[6] Kamau did not go to Concern's Wyomissing office or sign the Concern Release for East Penn. Instead, he decided that the Concern Release for his PCP satisfied East Penn's request. Id. ¶ 70. Kamau never notified East Penn that he had not gone to Concern's Wyomissing office or that he did not sign the Concern Release for East Penn that had been presented to him at the meeting. Id. ¶ 71.

On Friday, January 29 and again on Monday, February 1, Snyder called Kamau. When no one answered on either occasion she left a message. Kamau did not return either of the calls. Id. ¶ 72. Snyder also contacted Concern on the morning of February 1 and was told by Concern that they could not speak to her concerning Kamau's situation. Snyder concluded form this call that Kamau still had not signed the Concern Release for East Penn. Id. ¶ 73.[7] That afternoon, Snyder terminated Kamau's employment. Id. ¶ 75.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "material" only if it might affect the

---

[6] Without the permission or even knowledge of Snyder and DiBenedetto, Kamau secretly recorded this meeting with a cellphone concealed in his jacket pocket. Id. ¶ 69.

[7] Unknown to East Penn at the time, Kamau met with a counselor from Concern on January 14 and 21. The counselor's notes from those meetings show that Kamau refused to allow the counselor to have any contact with East Penn even for the limited purpose of discussing his fitness for duty. Id. ¶ 74.

10

outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

A party moving for summary judgment always bears the initial burden of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing relevant portions of the record, including depositions, documents, affidavits, or declarations, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c). Summary judgment is therefore appropriate when the non-moving party fails to rebut the moving party's argument that there is no genuine issue of fact by pointing to evidence that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322; Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992).

Under Rule 56, the Court must draw "all justifiable inferences" in favor of the non-moving party. Anderson, 477 U.S. at 255. The Court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the Kamau on the evidence presented." Id. at 252. The nonmoving party cannot avert summary judgment with speculation or conclusory allegations, such as those found in the pleadings, but rather, must present clear evidence

from which a jury can reasonably find in its favor. Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999).

## III. DISCUSSION

Courts analyze retaliation claims under Title VII, § 1981, and the PHRA pursuant to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006); White v. Gallagher Bassett Services, 257 F. Supp. 2d 804, 808 (E.D. Pa. 2003) ("[C]laims under the PHRA and § 1981 are analyzed in the same manner as Title VII.").

To survive summary judgment, a plaintiff must establish a prima facie case of retaliation by showing (1) a protected activity, (2) a materially adverse action, and (3) a causal link between the protected activity and the materially adverse action. Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997). If the plaintiff makes out a prima facie case, the burden of production "shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct. Id. If the employer advances such a reason, the burden of production shifts back to the plaintiff "to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Id. at 501. The burden of persuasion remains at all times with the plaintiff. Id.

### A. Prima Facie Case

East Penn does not dispute that Kamau engaged in protected activity when he filed his charge of discrimination, which East Penn was served on December 3, 2009. I therefore address only prongs two and three of Kamau's prima facie case.

12

### 1. Materially Adverse Action

An action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (citations and internal quotation marks omitted). The test for material adversity is flexible and focuses on the particular circumstances of the case rather than specific prohibited acts. Id. at 69.

Kamau cites three allegedly adverse actions: Snyder's recommendation on December 10, 2009, that he seek counseling[8]; Snyder's requirement on January 11, 2010, that he undergo a fitness-for-duty exam; and his termination on February 1, 2010. Doc. No. 27-2 at 5. East Penn does not dispute that Kamau's termination was a materially adverse action. Doc. No. 24-2 at 4-5.

Snyder's recommendation on December 10, 2009, that Kamau seek counseling was not a materially adverse action. Kamau concedes that following the meeting he continued to work his regular schedule without any change in his wages, benefits, or working conditions. Doc. No. 27-3 ¶ 31. Snyder's recommendation was not adverse to Kamau, and it cannot support his retaliation claim. Burlington N. & Santa Fe Ry. Co., 548 U.S. at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."); see also Morrison v. Carpenter Tech. Corp., 193 F. App'x 148, 154 (3d Cir. 2006).

---

[8] In his brief, Kamau contends that Snyder *required* him to seek counseling on December 10. There is no record evidence indicating that was the case. Indeed, although Kamau disputes her motive, he concedes that "Snyder *recommended* that [he] seek professional counseling" on December 10 and that Snyder decided not to force the issue when he refused. Doc. No. 27-3 ¶¶ 30-31 (emphasis added).

13

Snyder's requirement on January 11, 2010, that Kamau undergo a fitness-for-duty exam presents a closer case. "Generally, courts have rejected the argument that a fitness for duty examination, by itself, constitutes materially adverse action." Semsroth v. City of Wichita, 548 F. Supp. 2d 1203, 1211 (D. Kan. 2008), aff'd 555 F.3d 1182 (10th Cir. 2009); see also Franklin v. Potter, 600 F. Supp. 2d 38, 67 (D.D.C. 2009) ("[N]either the [fitness-for-duty] exams, nor plaintiff's orders to report for them, rose to the level of materially adverse actions."); Gordon v. U.S. Capitol Police, CIV. 12-00671 RJL, 2013 WL 543893, at *4 (D.D.C. Feb. 10, 2013) ("[A] fitness for duty examination, absent further evidence of humiliation or harm, does not rise to the level of an adverse employment action."); Jenkins v. Med. Laboratories of E. Iowa, Inc., 880 F. Supp. 2d 946, 963-64 (N.D. Iowa 2012); but see Dodd v. SEPTA, CIV.A. 06-4213, 2008 WL 2902618l, at *14 (E.D. Pa. July 24, 2008) (holding that "involuntary psychological exam" was materially adverse where it resulted in "a permanent record in [plaintiff officer's] personnel file and may be a detriment to obtaining law enforcement positions in the future").

The parties focus their arguments on Franklin and Jenkins. Doc. No. 24-2 at 4-5; Doc. No. 27-2 at 6-10. In finding that an involuntary fitness-for-duty exam was not a materially adverse action, the courts in both cases found determinative the innocuous nature of the exam itself and the lack of resulting harm. Franklin, 600 F. Supp. 2d at 67; Jenkins, 880 F. Supp. 2d at 964. East Penn contends that Kamau has produced no evidence that the two evaluations he underwent at Concern were humiliating or offensive, or that they produced an injury or harm. I agree. Kamau simply makes no argument, and

14

my review of the record reveals no evidence, that Kamau's evaluations at Concern "were egregious in some way," Franklin, 600 F. Supp. 2d at 67, or that complying with East Penn's mandate would have produced any change to his "pay, benefits, work duties, work conditions or career prospects," Jenkins, 880 F. Supp. 2d at 964. Accordingly, no reasonable employee in Kamau's situation would have found Snyder's counseling requirement materially adverse.

Kamau's attempts to distinguish Franklin and Jenkins are without merit. As for Jenkins, Kamau contends that unlike the plaintiff there, he was singled out for a fitness-for-duty evaluation. 880 F. Supp. 2d at 964 (observing that that plaintiff "was not singled out to attend EAP counseling" and that all three employees alleged to have "personality conflicts" were required to attend). Kamau reasons that he was singled out because Hoier, Parnoski, Lorah, Schaeffer, Zentner, and Pinter—the alleged tire deflators and individuals with whom Kamau now claims he had personality conflicts—were not required to undergo counseling. Doc. No. 27-2 at 7. This argument is clearly deficient in light of the undisputed facts. There is absolutely no evidence that Hoier, Parnoski, Lorah, Schaeffer, Zentner, or Pinter engaged in the sort of bizarre behavior Kamau *admits* he engaged in. Moreover, the record is devoid of any evidence that Kamau's alleged personality conflicts existed anywhere but in his mind or, more importantly, that they— and not Kamau's behavior—motivated East Penn's decision to require him to undergo counseling. All the individuals Kamau named as possible tire vandals denied his accusations. East Penn investigated Kamau's complaints and found them to be baseless. Kamau has produced no evidence to the contrary beyond his own testimony.

As for Franklin, Kamau simply misreads that case. The employer in that case advanced three legitimate, non-discriminatory reasons for requiring the plaintiff to undergo a fitness-for-duty exam: (1) letters from the plaintiff's physicians regarding his mood disorder and interactions with his co-workers, (2) the plaintiff's supervisor's perception of his odd behavior, and (3) the defendant's liberal use of fitness-for-duty exams in light of past workplace tragedies. 600 F. Supp. 2d at 68. These reasons had no bearing on the court's conclusion that "neither the exams, nor plaintiff's orders to report for them, rose to the level of materially adverse actions." Id. at 67. Rather, the court made clear that "*[i]n the alternative*, even if the exams could be adverse actions (*which they are not*)," the defendant's proffered reasons carried the day because the plaintiff could not show pretext. Id. (emphases added). These reasons were not, as Kamau suggests, necessary to the court's finding that the plaintiff suffered no materially adverse action.

Snyder's recommendation and subsequent requirement that Kamau undergo a fitness-for-duty exam were not materially adverse actions. I therefore move to prong three of Kamau's prima facie case with regard to his termination alone.

### 3. Causal Link

Generally, temporal proximity and evidence of ongoing antagonism serve to establish a causal link between protected activity and materially adverse action. Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 177 (3d Cir. 1997). However, "[t]hese are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." Id.; see also Farrell v. Planters Lifesavers Co., 206

16

F.3d 271, 281 (3d Cir. 2000) (encouraging courts to "explore the record in search of evidence" of causation).

Temporal proximity alone is sufficient to show causation only where it is "unusually suggestive of retaliatory motive." Williams v. Philadelphia Hous. Auth. Police Dept., 380 F.3d 751, 760 (3d Cir. 2004) (citations omitted). Sixty-nine days, for instance, is not an unusually suggestive period of time, id., while two days is, Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989). Here, East Penn was served Kamau's charge of discrimination on December 3, 2009; it terminated his employment sixty days later, on February 1, 2010. This period of time falls closer to the Williams end of the spectrum, and I conclude that it does not, by itself, establish causation.

Although insufficient standing alone, the sixty-day span in Kamau's case is still relatively short and provides a basis for inferring causation when combined with other evidence. Fasold v. Justice, 409 F.3d 178, 190 (3d Cir. 2005) (holding that three-month time span was short enough to "provide an evidentiary basis from which an inference of retaliation can be drawn"). The only other evidence Kamau points to is East Penn's allegedly differing treatment of other employees who were required to obtain counseling. Doc. No. 27-2 at 12-15. Kamau's evidence, however, only serves to underscore that his termination was in no way related to his charge of discrimination. Kamau picks out three employees who East Penn required to undergo mental health examinations and who were later terminated for failing to do so. He argues that these employees "cannot negate [his] retaliation claim" because they were required to undergo counseling for different reasons than he. Id. at 14. This evidence is neither surprising, given Kamau's one-of-a-kind

17

behavior, nor relevant, given that it does not link Kamau's charge with his termination. It is undisputed that East Penn has in the past terminated *nine* employees, none of whom engaged in protected activity, for failing to comply with an EAP mandate. Doc. No. 24, Ex. 21. In fact, Kamau has produced no evidence that East Penn ever permitted an employee who failed to comply with an EAP mandate to continue working. Kamau's "comparator" evidence thus only confirms that East Penn consistently enforces EAP mandates without regard to protected activity.

Kamau has failed to establish a causal link between his PHRC charge and his termination. His prima facie case therefore fails, and I will grant summary judgment in East Penn's favor.

### B. Legitimate, Nondiscriminatory Reason/Pretext

Even if Kamau could make out a prima facie case, East Penn has produced a legitimate, nondiscriminatory reason and Kamau has failed to show pretext. Fuentes v. Perskie, 32 F.3d 759, 764-65 (3d Cir. 1994). East Penn contends that it fired Kamau after he refused to sign a release authorizing Concern to communicate with East Penn regarding his fitness for duty. To the extent he disputes East Penn's proffered reason, he contends that he thought he did sign the release and that East Penn fired him after he realized his mistake but before he could correct it. The undisputed facts do not support this claim.

Indeed, Snyder met with Kamau on Monday, January 25 after it became apparent that he had signed a release only for his PCP and not for East Penn. During the meeting, Snyder showed Kamau the release for East Penn and asked him to sign it. Kamau

18

responded that he thought he had already did. Snyder replied that the information she had received from Concern led her to conclude that he had not signed the release for East Penn. After numerous attempts to persuade Kamau to sign the form, including having a manager from Concern on the phone with Kamau explaining the form to him, he told Snyder that he would go to Concern's Wyomissing office and sign the form there. Snyder then told Kamau that she would give him until Friday, January 29 to sign the form, but if it was not signed by then, his employment would be terminated. Kamau did not go to Concern's Wyomissing office or sign the release for East Penn. Instead, he decided that the release for his PCP satisfied East Penn's request. Kamau never notified East Penn that he had not gone to Concern's Wyomissing office or that he did not sign the release for East Penn that had been presented to him at the meeting. Kamau freely admits these facts, Doc. No. 27-3 at ¶¶ 63-71, which if anything suggest an extraordinarily considerate and patient employer who went out of its way to assist one of its employees. Kamau had ample opportunity to correct his alleged mistake and sign the release, and he in fact informed East Penn that he would do so.

Kamau's other arguments regarding pretext are unavailing. He claims that Snyder asked him to drop his PHRC charge. Kamau Dep. at 124. Snyder flatly denies this accusation. Snyder Dep. at 36. Even accepting Kamau's version of events and assuming, as Kamau suggests, that Snyder's request reflected some level of "discomfort" with his PHRC charge, Doc. No. 27-2 at 15, no jury could reasonably conclude that East Penn's nondiscriminatory reason was a pretext where the undisputed evidence indicates that *Snyder* exhaustingly attempted to obtain from Kamau a signed release. Finally, Kamau

19

simply falls back on his prima facie case. He argues that of the nine other employees who East Penn terminated for failing to comply with an EAP mandate, he is the only one who engaged in protected activity. Kamau suggests this is evidence of pretext. Quite the opposite, this is strong evidence that East Penn's proffered reason was not a pretext for discrimination. E.g., Grady v. Cracker Barrel Old Country Store, Inc., 4:CV 06 558, 2007 WL 1959298, at *10 (M.D. Pa. July 2, 2007) (finding that employer's history of terminating employees for proffered non-discriminatory reason, regardless of protected activity, is evidence that reason is not pretext).

For these reasons, Kamau's retaliation claims would fail even if he could establish a prima facie case.

## IV. CONCLUSION

East Penn's motion for summary judgment is granted.

An appropriate order follows.